# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN
### SOUTHERN DIVISION

Jane Doe,

                Plaintiff,

v.

Plymouth-Canton Community
Schools, *et al.*,

                Defendants.

_____/

Case No. 19-10166

Judith E. Levy
United States District Judge

Mag. Judge Curtis Ivy, Jr.

## OPINION AND ORDER DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT [37] AND GRANTING IN PART DEFENDANTS' MOTION FOR SUMMARY JUDGMENT [33]

This is a sex-discrimination case. Before the Court are cross-motions for summary judgment filed by Plaintiff Jane Doe and Defendants Plymouth-Canton Community Schools ("PCCS"), Angel Lett, Montyne Barbee, Elizabeth Mosher, and Hal Heard III. (ECF Nos. 33, 37.) Doe, a ninth-grade student in the PCCS school district during the 2016–2017 school year and a tenth-grade student during the 2017–2018 school year, alleges that Defendants failed to prevent H.B., another PCCS student whom she briefly dated, from sexually harassing her.

For the reasons set forth below, Doe's motion for summary judgment (ECF No. 37) is denied and Defendants' motion for summary judgment (ECF No. 33) is granted in part.

## I.   BACKGROUND

### A.   Facts

In the summer of 2016, just before Doe started ninth grade, Doe was involved in a brief romantic relationship with a PCCS high school student, H.B. During the two to three weeks that they dated, Doe told H.B. about the sexual assault she experienced as a child. Specifically, when Doe was two years old, she was sexually assaulted by a babysitter's husband and physically assaulted by her babysitter.[1] (*See, e.g.*, ECF No. 34, PageID.576–580.) Doe and H.B.'s relationship ended in August 2016.

In September 2016, Doe started ninth grade at Canton High School ("Canton"), a high school within the PCCS school district. Canton is co-

---

[1] Doe had other very difficult experiences before she started high school in the fall of 2016. In 2015, when she was in eighth grade, Doe she was diagnosed with post-traumatic stress disorder. (*See* ECF No. 34-1, PageID.695.) One of Doe's older brothers is "high-functioning autistic," and he had aggressive physical outbursts related to his disability. (*See* ECF No. 34, PageID.548; ECF No.34-1, PageID.694.) In 2016, Doe's mother was battling cancer. (*See id.* at PageID.698.) According to a medical record, Doe had attempted suicide four times prior to her suicide attempt in April 2017. (*See* ECF No. 34-30.)

located at the Plymouth-Canton Educational Park (the "Park") with two other PCCS high schools: Plymouth High School ("Plymouth") and Salem High School ("Salem"). PCCS students attending schools at the Park may take classes at and use the facilities of all three schools but play sports for and graduate from their "home" school. (ECF No. 34, PageID.557.) In September 2016, H.B. started his junior year at Salem.

Shortly after she started school at Canton, Doe told PCCS employees that H.B. harassed her in the halls, during lunch, and during extracurricular activities. Although she states that she never talked to him, Doe estimates that H.B. called her derogatory names such as "bitch," "whore," and "slut," and made lewd gestures toward her at least once per week. (*Id.* at PageID.561–568.)

In response, Ms. Lett—who was the Assistant Principal at Salem—had several conversations with H.B. and spoke with his mother about his treatment of Doe. (*See, e.g.*, ECF No. 33-6, PageID.240–241, 265.) H.B. denied having any "problems" with Doe, but Doe continued to report that H.B. harassed her at school.[2] (*Id.* at PageID.240–241.) By October 2016,

---

[2] Doe's testimony is inconsistent with respect to her interactions with H.B. Despite reporting that H.B. continued to harass her throughout the 2016–2017 school year, Doe also testified that her December 2016 written statement reporting

Ms. Lett instructed H.B. not to communicate with Doe in any way, including by social media or through third parties, and warned him and his family that discipline could "escalate" from this verbal instruction if he harassed Doe. (*Id.* at PageID.241.)

Doe made at least ten complaints about H.B.'s harassment to PCCS officials over the course of the 2016–2017 and 2017–2018 school years, which the Court sets forth below as Plaintiff does in her complaint. In the midst of these complaints of harassment, Doe attempted suicide in April 2017.

Although PCCS's Title IX Reporting Process and anti-harassment policy mandated that complaints of sexual harassment be reported to the Title IX coordinator (ECF No. 37-15), none of Doe's complaints were brought to the attention of PCCS's Title IX Coordinator until late 2018 (ECF No. 42-2, PageID.1317). Indeed, several PCCS officials to whom Doe complained, including Ms. Lett, Ms. Barbee, and Ms. Bean, either were not trained in PCCS Title IX procedures or could not remember

---

harassment that she had not had any contact with H.B. after the first two weeks of school in September 2016. (*Compare* ECF No. 34-4, PageID.733 *with* ECF No. 34, PageID.586.) There is no evidence that Doe and H.B. had any verbal interaction in the 2017–2018 school year.

having received such training prior to the incidents in this case. (*See* ECF No. 33-6, PageID.237; ECF No. 33-7, PageID.275; ECF No. 33-8, PageID.319.)

>  i. *First Complaint*

Around December 2016, Doe reported to her guidance counselor, Ms. Bean, that H.B. told one of Doe's friends that he hoped that Doe "would be raped again," referencing her sexual assault as a child. (*See* ECF No. 34-4, PageID.733.) Doe did not hear the comment herself, and H.B. "vehemently denied" Doe's allegation. (*See* ECF No. 33-6, PageID.251.) Doe wrote a statement describing her allegation, which PCCS did not corroborate.

Ms. Bean notified H.B.'s parent and Ms. Lett about the incident by email. (*See* ECF No. 34-4, PageID.733; ECF No. 33-15, PageID.419.) Within approximately one day of receiving Ms. Bean's email, Ms. Lett told H.B. not to discuss Doe in any way with anyone. In that same time frame, Ms. Bean referred Doe to counseling. (*See* ECF No. 33-6, PageID.268; ECF No. 34-39.)

>  ii. *Second Complaint*

At a school event called the Snowcoming Dance, which took place in February 2017, Doe reported to Ms. Bean that H.B. told Doe's friend,

S.M.[3], that H.B. "hoped [Doe] got raped again." (ECF No. 34, PageID.592.) As with the incident leading to the first complaint, Doe did not directly hear H.B.'s comment. (*See id.*) Ms. Bean relayed Doe's report to Ms. Lett. Ms. Lett testifies that she participated in an investigation of Doe's complaint but that PCCS did not corroborate that H.B. made the comment.

There is conflicting evidence regarding the timing and substance of PCCS's investigation of Doe's complaint.[4] However, it is uncontested that PCCS officials failed to interview Doe, who was not involved in the incident in any direct way, and that PCCS's Title IX Coordinator was not

[3] The parties did not submit a deposition from S.M., though she is listed on Plaintiff's first amended witness list. (*See* ECF No. 62, PageID.2326.)

[4] The evidence in the record regarding the investigation's timing as well as the information gathered during the investigation is equivocal. Ms. Lett—who failed to take notes during her investigation—states that she interviewed students immediately after the incident; however, at a deposition, Doe's counsel indicates that the date that appears on the investigation report is May 9, 2017, approximately three months after the incident. (*See* ECF No. 33-6, PageID.248.) As to the substance of the investigation, Ms. Lett testifies that when she interviewed S.M. about H.B.'s comment, S.M. "could never independently say she heard those words come out of his mouth." (ECF No. 33-6, PageID.248, 250; *see* ECF No. 34-10, PageID.768 ("[S.M.] reports that she has not heard H.B. say anything directly to her.") But Ms. Barbee testifies that on May 30, 2017, S.M. told her that H.B. said at the Snowcoming Dance that he hopes Doe "gets raped again." (ECF No. 33-7, PageID.305; ECF No. 34-10, PageID.769.)

notified of the complaint during the 2016–2017 school year. (ECF No. 42-2, PageID.1317.)

### iii.   Spring Break Incident

Although the parties dispute whether this incident occurred[5], Doe's mother, E.L., testifies that over PCCS's spring break in 2017, the word "whore" was written in animal feces on their garage, toilet paper was strewn around the outside of the house, their car's tires were flattened, and toilet paper with feces on it was smeared on the car. (*Compare* ECF No. 34-1, PageID.703, 725 *with* ECF No. 44, PageID.1884.) In her deposition, E.L. opines that although she is not "100 percent" certain who committed these acts of vandalism, she thinks that H.B. and his friends did it. (*Id.* at PageID.703.) PCCS did not investigate this incident.

### iv.   Third Complaint

Following the Snowcoming Dance, Doe reported to Ms. Bean that H.B.'s verbal harassment "picked up again." (ECF No. 33-17, PageID.421.) Doe told Ms. Bean that she overheard H.B. calling her a "slut" and that he makes "puking noises" when she walks by, and that

---

[5] Attached to her reply, Doe submits pictures of a garage and driveway with toilet paper on them, but not obscene messages. (*See* ECF No. 50-7, PageID.2020.) E.L., testifies that she cleaned up the mess immediately, before taking the pictures, because she did not want the neighbors to see it.

H.B. and another student had stuck up their middle finger at Doe. (*Id*.) Ms. Bean relayed Doe's complaint to Ms. Lett and H.B.'s counselor, Slavica Vldojevski. (*See* ECF No. 33-6, PageID.253.)

On April 11, 2017—soon after PCCS students returned to school after spring break—Doe reported to Ms. Bean that before spring break, H.B. had continued to verbally harass her and make gestures toward her. (ECF No. 34, PageID.599–600.)

### v.   *Doe's Suicide Attempt And Hospitalization*

On April 12, 2017, Doe overdosed on Adderall and went to school the next day. (*Id*. at PageID.615.) She was taken to the hospital on April 14, 2017, and was admitted for psychiatric care "following her 5th and most serious suicide attempt via adderall overdose." (ECF No. 34-30.) Doe testifies that she attempted suicide because "[H.B.'s] harassment wasn't stopping." (ECF No. 34, PageID.604.) Defendants contend that Doe's medical records reflect that she did not attempt suicide because of H.B.'s "cruel remarks" but rather because a student who attended another school, Eddy, ended his friendship with Doe hours before her attempted suicide; Eddy's friends joined the phone call and called Doe a "whore" and told her "she deserved to be raped." (ECF No. 34-30,

8

PageID.850; ECF No. 34-31, PageID.853.) Doe did not return to school until May 4, 2017. (*See, e.g.*, ECF No. 34-7.)

PCCS and Doe's family agreed to several changes to facilitate Doe's safe return to school. (*See, e.g.*, ECF No. 33-7, PageID.286.) To ease her social anxiety, Doe was given access to a Zen room to use when she felt anxious, her schedule was modified so that she would not have any classes in the same building as H.B., and she was eventually given an emergency hall pass. (*See* ECF No. 34-1, PageID.706.) To mitigate academic stress, Doe was provided extra time to complete assignments, was given fewer assignments, and was permitted to withdraw from a math class that she was failing at the time of her overdose. (*Id.*)

> vi.   *Fourth Complaint*

E.L. testifies in her deposition that after Doe returned to school in May 2017, Doe did not report any troubling interactions with H.B. (*See id.* at PageID.707, 710.) However, E.L. also provides the conflicting testimony that on May 19, 2017, before the school year ended, H.B. followed Doe outside onto a pedestrian path and also waited for her at

9

the top of the stairs.[6] (*See id.* at PageID.707–709.) PCCS staff and School Resource Officers ("SROs") reviewed video footage of the relevant areas from the date and time of the alleged incidents. (*See* ECF No. 34-12, PageID.787.) In an email dated June 1, 2017, Ms. Barbee, the assistant principal at Canton, notified E.L. that PCCS's video review did not substantiate Doe's claim. (*See* ECF No. 34-1, PageID.708.)

### vii.   Fifth And Sixth Complaints

Doe continued to run into H.B. while at school. On June 1, 2017, Doe report to the assistant principals that H.B. followed her. (*See* ECF No. 33-7, PageID.292.) Although video footage of the incident did not corroborate Doe's complaint (*id.*) and Doe could not recall the incident during her deposition (ECF No. 34, PageID.630), Ms. Lett interviewed H.B. and H.B.'s mother regarding the incident. (*See* ECF No. 34-3, PageID.731.)

On June 8, 2017, Doe complained to Ms. Barbee that H.B. was outside of her classroom. (*See* ECF No. 34-10, PageID.771.) In response, PCCS Changed H.B.'s schedule again, changed his dismissal time, and

---

[6] Doe describes this incident in the complaint, but she did not remember this incident during her deposition. (*Compare* ECF No. 1, PageID.16 *with* ECF No. 34, PageID.631.)

required him to park in a specific lot to reduce the likelihood of any contact with Doe. (*See* ECF No. 33-7, PageID.292–293; *see also* ECF No. 34-13 PageID.789.)

### viii.  Seventh Complaint

On September 5, 2017, shortly after the beginning of the 2017–2018 school year, Doe reported to PCCS that she came across H.B. in the hallway. That day, PCCS changed her schedule so that she would not incidentally encounter H.B. at school. (*See* ECF No. 34-1, PageID.713–715.)

Then, Doe reported to Ms. Barbee that H.B. intimidated her by staring at her during football games. (*See* ECF No. 33-7, PageID.294.) Doe played in the school band and E.L. states that H.B. stood by the gate that the band used to enter the field and that Doe noticed H.B. staring at her. (*See* ECF No. 34-1, PageID.711–713.) Ms. Barbee testifies that PCCS investigated the complaint and told Doe that an SRO would be sitting near the band, available to support Doe at football games. (*See* ECF No. 33-7, PageID.294–295.)

### ix.  Eighth Complaint

On September 19, 2017, Doe reported to Ms. Barbee that H.B. "pushed" her on her side as the two of them crossed paths after school,

11

causing Doe to hit a metal fence and hurt her hand. (ECF No. 34, PageID.640–652; ECF No. 33-7, PageID.289.)

PCCS could not corroborate the incident after an investigation. Ms. Lett testifies that a silent video recording shows no one pushing Doe. (*See* ECF No. 33-7, PageID.289.) H.B., Doe, and a friend of Doe's[7] who was with her at the time of the alleged incident gave written statements to the school; however, Doe's statement is the only one confirming that H.B. pushed her. (*See* ECF Nos. 34-18, 34-19.)

E.L. reported the September 19, 2017 fence incident to the police. (*See* ECF No. 34-1, PageID.717; *see also* 34-17.)  The police investigated but did not find any evidence corroborating Doe's allegation in their report. (*See* ECF No. 34-17.) Although E.L. requested that H.B. be prosecuted, a warrant for H.B. was denied. (*See id.* at 804; ECF No. 33-7, PageID.289.) However, following this allegation, PCCS installed camouflaged and hidden video cameras throughout the Park campus to enhance surveillance of students. (*See* ECF No. 33, PageID.195; *see also* ECF No. 33-10, PageID.371.)

---

[7] The parties did not submit a deposition of A.S.

12

x.    *Ninth Complaint*

On October 25, 2017, Doe obtained a Personal Protective Order ("PPO") against H.B.[8] Doe gave a copy of the PPO to Ms. Barbee on October 26, 2017. (*See* ECF No. 33-7, PageID.296.) Soon thereafter, Doe reported to a PCCS official that she encountered H.B. in a stairwell in the South Tower and the North Tower hallway, although SRO Andrew Colthurst's investigation of the complaint only mentions that Doe reported encountering H.B. in the South Tower. (*Compare* ECF No. 34, PageID.660 *with* ECF No. 34-23, PageID.816.)

SRO Colthurst—an employee of the Canton Police Department stationed at PCCS, but not a PCCS employee—investigated Doe's complaint but did not corroborate that H.B. was stalking Doe. After reviewing all relevant video footage, SRO Colthurst wrote "[t]here is no reasonable explanation as to why [Doe] has appeared in the South Tower of Salem High School."[9] (*See* ECF No. 34-23, PageID.817.) SRO Colthurst

---

[8] H.B., then a minor, contested the PPO without the assistance of an attorney. The judge who issued the PPO upheld it. (*See* ECF No. 34-1, PageID.718.)

[9] Ms. Lett and Ms. Barbee testify that they believed the PPO was unenforceable at school. (*See* ECF No. 33-6, PageID.262; ECF No. 33-7, PageID.297.) SRO Colthurst states that it was his understanding that it was not PCCS's responsibility to enforce a PPO and that Doe's PPO from H.B. permitted the two of

explained that given Doe's schedule, there was "no obvious reason" for Doe to be in the hallway where she encountered H.B. (*Id* at 818.)

### xi.   Tenth Complaint

Soon after Doe reported encountering H.B. in the hallway, Doe reported to Ms. Barbee that H.B. "grabbed her arm" while passing her on a pedestrian bridge between Salem and Plymouth. (*See* ECF No. 37-14, PageID.1096.)

SRO Colthurst also investigated this complaint. (*See id.*; ECF No. 33-10, PageID.367–368.) He reviewed video footage of the walkway at the time of the alleged incident and determined that "[i]t appeared impossible that [Doe and H.B.] could have been on the bridge at the same time." (*Id.*)

### xii.   SRO Colthurst Speaks To E.L. Following The November 2, 2017 Incident

The parties dispute what SRO Colthurst said to E.L. when he told her that he did not corroborate Doe's complaint. SRO Colthurst wrote in a report that he informed E.L. that "the evidence strongly suggests that

---

them to be nearby one another so long as there was not contact. However, upon inspecting the PPO during his deposition, SRO Colthurst realized that H.B. was not permitted to be within Doe's line of sight. (*See* ECF No. 33-10, PageID.360–361, 364–365.)

Jane Doe fabricated this incident" and "that doing so was not only criminal, but it suggests that something [else] may be occurring with Jane Doe tha[t] needs to be addressed." (ECF No. 37-14, PageID.1099; *see* ECF No. 33-10, PageID.369.) However, E.L. testifies that SRO Colthurst called her following his investigation and told her that "[SRO Colthurst] did not believe [Doe] and that if [Doe] continued to make up stories [SRO Colthurst] was going to file felony charges against her." (ECF No. 34-1, PageID.720.)

Thereafter, H.B. enrolled in another school in the PCCS school district, and Doe did not report any further contact with H.B. at school.[10] During the 2018–2019 school year—the school year following the incidents at issue in this case—Doe received homebound instruction for part of the year. (*See* ECF No. 34, PageID.671–674, 686–687.)

## B.   Procedural History

On January 17, 2019, Doe filed the complaint in this matter. (ECF No. 1.) Doe asserts five claims: (I) PCCS's failure to address sex-based harassment of Doe was deliberate indifference to sex discrimination in

---

[10] On consent, claims against Ms. Bean were dismissed with prejudice. (ECF No. 27.)

violation of Title IX, 20 U.S.C. §1681, and its implementing regulations; (II) SRO Colthurst's "threat" to file charges "if [Doe] made another 'false' report" was retaliation under Title IX; (III) Defendants Ms. Lett, Ms. Barbee, Ms. Mosher[11], and Mr. Heard[12] were deliberately indifferent to sex discrimination of Doe in violation of her Fourteenth Amendment right to equal protection[13] under 42 U.S.C. §1983; (IV) PCCS's failure to investigate sexual harassment of female students, failure to train PCCS employees in Title IX, and delegation of investigation to SROs in violation of Title IX was disparate treatment of female students in violation of the Fourteenth Amendment right to Equal Protection under §1983 (the

---

[11] From the fall of 2017 until the fall of 2018, Ms. Mosher was the Director of Professional Development and curriculum at PCCS. (*See* ECF No. 33-12, PageID.389.)

[12] Mr. Heard was the principal of Canton in the 2016–2017 school year and the interim principal of Canton in the 2017–2018 school year. (*See* ECF No. 33-13, PageID.399–400.)

[13] It appears that Plaintiff's Fourteenth Amendment claim under 42 U.S.C. §1983 is based only on the Equal Protection Clause. Although Plaintiff references her right "to personal security [and] bodily integrity," phrases associated with the Fourteenth Amendment right to Substantive Due Process (ECF No. 1, PageID.26), Plaintiff clarifies in her response to Defendants' summary judgment motion that she does not argue that "she has a constitutional right to be protected from harm by other students" in her Fourteenth Amendment claim, but rather that it "is premised on . . . the Equal Protection Clause." (ECF No. 42, PageID.1283–1284.)

16

"municipal liability claim"); and (V) PCCS's policies and practices of failing to properly warn and train its staff in the prevention of sexual harassment and investigation of reports of sexual harassment disparately impact female students in violation of the Elliott-Larsen Civil Rights Act. (*Id.* at 24–28.) Doe seeks compensatory damages, injunctive relief, statutory interest, costs, and attorney fees.

On September 30, 2020, the parties filed cross-motions for summary judgment. (ECF Nos. 33, 37.) Defendants seek summary judgment as to all of Doe's claims: her federal law claims (Counts I–IV) as well as her state law claim under the Elliott-Larsen Civil Rights Act (Count V). (ECF No. 33.) Doe seeks summary judgment on her Title IX sex discrimination claim (Count I). (ECF No. 37.)

## II.   LEGAL STANDARD

Summary judgment is proper when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The Court may not grant summary judgment if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The Court "views the evidence, all

17

facts, and any inferences that may be drawn from the facts in the light most favorable to the nonmoving party." *Pure Tech Sys., Inc. v. Mt. Hawley Ins. Co.*, 95 F. App'x 132, 135 (6th Cir. 2004) (citing *Skousen v. Brighton High Sch.,* 305 F.3d 520, 526 (6th Cir. 2002)).

The standard for evaluation of cross-motions for summary judgment is the same as the summary judgment standard. *See Golf Vill. N. LLC v. City of Powell, Ohio*, 826 F. App'x 426, 431 (6th Cir. 2020) (quoting *Craig v. Bridges Bros. Trucking LLC*, 823 F.3d 382, 387 (6th Cir. 2016)). The Court evaluates each party's motion on its own merits, drawing all reasonable inferences against the party whose motion is under consideration. *See id.* As with any other evaluation of a motion for summary judgment, judgment is not proper where disputes remain with respect to materials facts. *See id.*

## III.   ANALYSIS

### A.      Title IX Sex Discrimination (Count I)

"[I]n certain limited circumstances" student-on-student sexual harassment can give rise to Title IX liability. *Davis v. Monroe Cty. Bd. of Educ.*, 526 U.S. 629 (1999). A school is liable for student-on-student harassment under Title IX if the student pleads and ultimately proves

that: 1) an incident of "actionable" sexual harassment occurred, 2) the school had "actual knowledge" of the actionable harassment, 3) a further incident of actionable harassment occurred, 4) the further actionable harassment would not have happened but for the objective unreasonableness (deliberate indifference) of the school's response, and (5) the Title IX injury is attributable to the post-actual-knowledge further harassment. *Kollaritsch v. Mich. State Univ.*, 944 F.3d 613, 620, 623–24 (6th Cir. 2019).

To assess Doe's Title IX claim of sex discrimination, the Court first sets forth the applicable standard for "actionable harassment." Evaluating the incidents at issue in a light most favorable to Doe, she fails to establish a material issue of fact as to whether she experienced actionable harassment. Second, although Defendants are entitled to summary judgment on Doe's Title IX discrimination claim because she did not experience actionable harassment, the Court also addresses whether PCCS was deliberately indifferent to Doe's complaints under Title IX. Considering the facts in a light most favorable to Doe, the Court finds that PCCS was not deliberately indifferent to the alleged sex-based harassment.

19

i.   *"Actionable Harassment" under Title IX*

Defendants argue that Doe fails to identify student-on-student harassment that is sufficiently "severe AND pervasive AND objectively offensive sex-based harassment" to be "actionable" under Title IX. (*See* ECF No. 33, PageID.202–208 (emphasis in original) (citing *Kollaritsch*, 944 F.3d at 621).) It is Doe's position that the incidents in this case— what Doe characterizes as persistent verbal harassment, stalking, and physical harassment—amount to actionable harassment under Title IX. (*See* ECF No. 37, PageID.904–906.)

"For student-on-student sexual harassment to be *actionable* under *Davis*'s Title IX private-cause-of-action formulation, it must be (a) severe, (a) pervasive, and (c) objectively offensive." *Kollaritsch*, 944 F.3d at 620 (emphasis in original). The Sixth Circuit indicates that

> "[s]evere" means something more than just juvenile behavior that is antagonistic, non-consensual, and crass . . . . "simple acts of teasing and namecalling" are not enough, "even where these comments target differences in gender."
> "Pervasive" means "systematic" or "widespread," . . . one incident of harassment is not enough. . . .
> "Objectively offensive" means behavior that would be offensive to a reasonable person under the circumstances, not merely offensive to the victim, personally or subjectively. . . . The victim's perceptions are not determinative.

20

*Id.* at 620–21 (citing *Davis*, 526 U.S. at 651–53). Moreover, to be "severe, pervasive, and objectively offensive," the harassment must also effectively deny the target of their education. *Vance v. Spencer Cty. Pub. Sch. Dist.*, 231 F.3d 253, 259 (6th Cir. 2000). For peer-to-peer harassment to be actionable under Title IX, it must also be sex-based harassment. *See, e.g.*, *Univ. of Ky.*, 959 F.3d at 251–52.

Doe was undoubtedly suffering during the relevant time period. However, considering all of the incidents together or individually, Doe cannot establish that she suffered severe, pervasive, objectively offensive, and sex-based harassment. First, for peer-to-peer harassment to be "actionable" under Title IX, the school must exert control over the students and the harassment must be sex based, and here, the only sex-based harassment that Doe alleges was verbal harassment. Second, although extraordinary verbal harassment may rise to the level of actionable harassment, the verbal harassment in this case was less severe or pervasive than other cases in which courts found that the harassment was not actionable.

### a)    *Several Incidents Of Claimed Harassment Were Not Sex-Based Or Sexual Harassment Under Title IX*

To begin with, all of the incidents that Doe claims occurred after spring break in 2017 are not actionable as a matter of law because she fails to show that they were sex-based.[14] Regardless of whether the two

---

[14] The Court is not persuaded by Doe's argument that the incidents at issue in this case qualify as "dating violence." (*See* ECF No. 42, PageID.1264.) The out-of-Circuit district court cases Doe cites as supporting her argument that courts recognize "dating violence" as actionable harassment under Title IX are distinguishable from this case. *Roohbakhsh v. Bd. of Trustees of Nebraska State Colleges*, 409 F. Supp. 3d 719, 724 (D. Neb. 2019) involved a college student who committed suicide after being in a violently abusive relationship with another student for years, whereas Doe dated H.B. for approximately three weeks. *Krebs v. New Kensington-Arnold Sch. Dist.*, No. CV 16-610, 2016 WL 6820402, at *8 (W.D. Pa. Nov. 17, 2016) was decided on a motion to dismiss, a different procedural posture and standard than the summary judgment motion in this case. In *Bruning ex rel. Bruning v. Carroll Cmty. Sch. Dist.*, 486 F. Supp. 2d 892, 902–05 (N.D. Iowa 2007), the middle school students, who considered themselves boyfriend and girlfriend at various times, grabbed and kicked one another's breasts and genital areas. In contrast, in this case, the claimed physical harassment and stalking was not intrinsically sexual.

Although Defendants argue that the Department of Education's Title IX regulation 34 C.F.R. § 106.30 is inapplicable to this case because it was not enacted when the incidents in this case took place, it shows why H.B. and Doe's relationship would be unlikely to qualify as a dating relationship under the regulation. 34 C.F.R. §106.30, relying on a term from another statute, defines "dating violence" as

> violence committed by a person--
> (A) who is or has been in a social relationship of a romantic or intimate nature with the victim; and
> (B) where the existence of such a relationship shall be determined based on a consideration of the following factors:
> > (i) The length of the relationship.
> > (ii) The type of relationship.
> > (iii) The frequency of interaction between the persons involved in the relationship.

incidents of alleged physical harassment in the fall of 2017 occurred–
when H.B. pushed Doe into the fence and touched her sleeve on the path
between school buildings—or Doe's encounters with H.B. in the hallways,
they are similar to incidents in other cases that were not considered
actionable harassment under Title IX because they were not sex-based or
sexual harassment. Another student raped the plaintiff in *Doe v. Univ.
of Ky.* and following the attack, he stared at her, stood by her at a party,
followed her home, sat near her in the library, and stared at her during
class. 959 F.3d 246, 251–52 (6th Cir. 2020). The Sixth Circuit determined
that the assailant's actions after the rape were neither "sexual
harassment" nor actionable sexual harassment. Similarly, in *M.D. by &
through Deweese v. Bowling Green Indep. Sch. Dist.*, the plaintiff was
sexually assaulted by a teammate, but the Sixth Circuit held that
plaintiff seeing her attacker in the hallway at "a handful of school events"
did not qualify as "actionable harassment" because it was not sexual or
sex based. 709 F. App'x 775, 778 (6th Cir. 2017). In this case, like *Univ.*

---

34 U.S.C. §12291 (a)(10). Although H.B. and Doe had a romantic relationship, it
lasted for less than one month. Therefore, the statutory factor of the "length of
relationship," weighs against a finding that H.B. and Doe's relationship would qualify
as a "dating relationship" under the regulation.

*of Ky.* and *M.D.*, the physical harassment that Doe alleges was neither sex-based nor sexual, and therefore, it is not actionable harassment.

Although the parties contest whether the alleged vandalism of Doe's family's car and garage door occurred and who was responsible, it is not "actionable harassment" under Title IX.[15] E.L. provides no basis other than the following to suggest that H.B. was involved: "I think [the vandalism was done by] H.B. or some of his friends because of the wording that was used." (ECF No. 34-1, PageID.703.) This is insufficient to create a question of material fact as to H.B.'s involvement in the incident or the incident's connection to Doe's education. Moreover, PCCS had no control over the incident. The vandalism occurred over spring break and off campus, and therefore, beyond the temporal and geographical reach over which PCCS could be expected to exert control based upon the facts of this case.

---

[15] Courts tend to consider harassment during academic instruction to be more severe and pervasive than similar harassment that occurs in school settings over which the school is expected to exert less control, such as extra-curricular activities or hallways. *Compare Vance*, 231 F.3d at 257 (harassment including daily propositioning and inappropriate touching in "virtually every class" actionable) *with Pahssen v. Merrill Cmty. Sch. Dist.*, 668 F.3d 356, 363 (6th Cir. 2012) (no allegation that harassment occurred during class and the harassment was not actionable).

> b)  *The Claimed Sex-Based Harassment Was Not Sufficiently Severe, Pervasive, And Objectively Offensive To Be "Actionable"*

Although it is possible to assert a Title IX claim based exclusively on verbal harassment, it is uncommon, because courts tend to consider verbal harassment to be less severe than physical harassment. *See Martin v. Swartz Creek Cmty*. Sch., 419 F. Supp. 2d 967, 974 (E.D. Mich. 2006) (citing two district court case sin other circuits in which the courts recognized a Title IX claim that did not include an allegation of sexual assault). However, the verbal harassment in this case was less severe and pervasive than the harassment in other Title IX cases involving actionable verbal harassment. The openly gay plaintiff in *Martin* endured actionable sexual harassment where, over the course of two school years, the school included a homophobic epithet directed at the plaintiff in a school mailing, a homophobic insult directed at the plaintiff was shared during a school assembly, and obscene homophobic messages were written on the plaintiff's locker and left there for days on display to the school community. In *Theno v. Tonganoxie Unified Sch. Dist No. 464*, the court found that four years of "unrelenting" verbal harassment was actionable under Title IX, significantly longer than the verbal

harassment at issue in this case. 377 F. Supp. 2d 952, 968 (D. Kan. 2005). Here, considering the facts in a light most favorable to Doe, the alleged verbal harassment persisted for less than one school year and Doe does not allege that H.B. repeatedly humiliated her in front of the rest of the school community.

The fact that Doe indirectly heard some of the verbal harassment at issue in this case is important to the analysis of its severity and pervasiveness. Here, Doe's friend told her that H.B. allegedly said that he "hopes [Doe] gets raped again."  That is, Doe might not have encountered these comments had her friend not elected to share them with her. In the absence of binding precedent on the severity and pervasiveness of disparaging comments that a student plaintiff indirectly encounters from other students, two cases are instructive.[16] In the first case, a court from the Western District of Michigan recently held (in an unpublished decision) that verbal harassment that a student plaintiff saw in online comments to a news story about sexual harassment that she experienced was not "severe and pervasive harassment." *See Doe v.*

---

[16] Doe neither cites any cases in which a plaintiff has established actionable harassment under Title IX on the basis of hearsay nor has the Court identified any such cases in its independent research.

26

*Centreville Pub. Schs.*, No. 1:17-cv-317, 2019 WL 10890258, at *11 (W.D. Mich. Apr. 29, 2019). In that case, the court emphasized that the plaintiff sought out the disparaging information and that the "people posting the comments had no idea she was reading them." *Id.* The court noted that "[u]nder other circumstances, some of the comments . . . would likely constitute actionable harassment." *Id.* In the second case the Court finds instructive for purposes of considering the severity and pervasiveness of indirect comments to a student plaintiff, the Fifth Circuit found that a student who overheard another student call her a "ho" did not experience actionable harassment. *See Sanches v. Carrollton-Farmers Branch Indep. Sch. Dist.*, 647 F.3d 156, 165 (5th Cir. 2011). The Fifth Circuit determined that because the student who made the comment "did not even make the comment to [the plaintiff] directly[,]" the disparaging comment "by no means qualifies as harassment at all." *Id.* The two cases discussed above demonstrate that where, as here, the alleged declarant does not directly share the disparaging comment with the plaintiff, or with the larger school community, the comments are considered less severe and pervasive under Title IX than harassment that a plaintiff

hears directly or that is disseminated more widely within a school community.

The verbal harassment incidents at issue in this case—as Doe describes them—resemble incidents of verbal harassment in cases in which courts determined that the harassment was not actionable. In a recent case from the Southern District of Ohio, following years of persistent harassment, an elementary school student threatened to tie the plaintiff up and rape her. *See Feucht v. Triad Loc. Sch. Bd. of Educ.*, 425 F. Supp. 3d 914, 931 (S.D. Ohio 2019). Although the plaintiff eventually completed suicide, the *Feucht* court held that the sex-based verbal harassment she endured was not severe, pervasive, and objectively offensive enough to be actionable under Title IX. The court reasoned that although the other students' threats were "unacceptable" they "d[id] not rise to the level of sexual harassment that is so severe, pervasive, and objectively offensive that it could be said to deprive the plaintiff of access to the educational opportunities or benefits provided by the school." *Id.* (quoting *Miami Univ.*, 882 F.3d 579, 591 (6th Cir. 2018)). In *Pahssen*, the Sixth Circuit held that three incidents of a male student harassing a female student—shoving the female student into a locker,

28

demanding oral sex from her, and making obscene gestures at her—were not actionable harassment, because "[w]hile disturbing, Appellant does not explain how the incidents deprived Jane of access to Merrill's educational resources, opportunities, or benefits." *Pahssen v. Merrill Cmty. Sch. Dist.*, 668 F.3d 356 (6th Cir. 2012). As in *Feucht* and *Pahssen*, the verbal harassment alleged in this case is vile, but it is not actionable.

       *ii.*    *Deliberate Indifference*

Doe contends that Defendants were deliberately indifferent to H.B.'s harassment because they failed to follow their own Title IX policy, failed to appropriately investigate Doe's complaints, and failed to discipline H.B., leaving her unprotected from his harassment. (*See id.* at 906–912.) Further, Plaintiff argues that a recent Sixth Circuit decision, *Doe on behalf of Doe #2 v. Metro. Gov't of Nashville & Davidson Cnty., Tenn.*, No. 20-6225, 2022 WL 1573848, at *6 (6th Cir. May 19, 2022), limits the *Kollaritsch* decision to universities and it therefore does not apply to high schools. (*See* ECF No. 61, PageID.2294.) Defendants seek to dismiss this claim because they argue that that they were responsive to Doe's complaints, and not deliberately indifferent to them. (*Id.* at 208–218.) Defendants contend that even though none of Doe's complaints

29

were substantiated and several were disproven, PCCS took prompt actions and tried new responses as Doe made more complaints. Even if Doe could establish that there was an incident of actionable harassment, her Title IX claim fails because she cannot establish that PCCS's responses to her claims were "clearly unreasonable."

The "four elements of a deliberate-indifference-based intentional tort [are] (1) knowledge, (2) an act, (3) injury, and (4) causation." *Kollaritsch*, 944 F.3d 621. "An 'Act' means a response by the school that was 'clearly unreasonable in light of the known circumstances,' thus demonstrating the school's deliberate indifference to the foreseeable possibility of further actionable harassment of the victim." *Kollaritsch*, 944 F.3d at 621 (quoting *Davis*, 526 U.S. at 643, 648). "A clearly unreasonable response [establishing deliberate indifference] might 'be a detrimental action, thus fomenting or instigating further harassment.' Or it might be 'an insufficient action (or no action at all)' that makes 'the victim vulnerable to, meaning unprotected from, further harassment.'" *Univ. of Ky.*, 959 F.3d at 251 (quoting *Kollaritsch*, 944 F.3d at 623). A deliberate indifference claim fails as a matter of law if any of the four elements cannot be proven.

Plaintiff's argument that the recent Sixth Circuit decision, *Doe on behalf of Doe #2,* limited "the *Kollaritsch* decision to claims brought against universities, as opposed to high schools" overstretches the holding of that decision. Instead, the Sixth Circuit "decline[d] to extend *Kollaritsch*'s *same-victim requirement* to a Title IX claim in a high school setting." *Doe on behalf of Doe #2*, 2022 WL 1573848, at *6 (emphasis added). In this holding, the Sixth Circuit reinforced the reasoning of *Davis* that schools have greater control over younger students than older students and that "deliberate indifference claims have special resonance when the school exercises substantial control over both the harasser and the context in which the known harassment occurs." *Id.* (alteration omitted) (quoting *Foster v. Bd. of Regents of Univ. of Mich.*, 982 F.3d 960, 970 (6th Cir. 2020)). *Doe on behalf of Doe #2* clarifies that high school students can make out a claim of deliberate indifference to sex-based harassment where a plaintiff asserts that sex-based harassment happened to more than one student, a holding that is inapplicable in this case because Doe does not allege that H.B. harassed other students. In any case, the standard of deliberate indifference articulated in *Kollatrisch* is still applicable to this case.

31

"Deliberate indifference" is a context-sensitive standard that "makes sense as a theory of direct liability under Title IX only where the funding recipient has some control over the alleged harassment." *Id.* (quoting *Davis*, 526 U.S. at 644). And the standard for deliberate indifference must account for the varying level of disciplinary authority available to the school, which depends largely on the level of schooling. *See id.* (citing *Davis*, 526 U.S. at 649). Put another way, courts may expect a high school to have a greater degree of control over its students than a university over its students. The deliberate-indifference inquiry also considers "'nature of the harassment,' its length, and the school's 'overall response[.]'" *Gordon v. Traverse City Area Pub. Schs.*, 686 F. App'x 315, 325 (6th Cir. 2017) (quoting *Stiles ex rel. D.S. v. Grainger Cty., Tenn.*, 819 F.3d 834, 850–51 (6th Cir. 2016)). To evaluate deliberate indifference, courts are to "ask not whether the school's efforts were ineffective but whether they amounted to 'an official decision . . . not to remedy the violation.'" *Foster*, 982 F.3d at 968 (quoting *Davis*, 526 U.S. at 648).

Deliberate indifference under Title IX is a "high bar" that only requires that school administrators respond to known student-on-

32

student harassment in a manner that is not "clearly unreasonable in light of the known circumstances." *Stiles*, 819 F.3d at 848 (quoting *Davis*, 526 U.S. at 648). It "is not a 'mere reasonableness standard'" and it does not require "that federal funding recipients purge their schools of actionable peer harassment or engage in particular disciplinary action to avoid Title IX liability." *Id.* (citing *Davis*, 526 U.S. at 644) (internal alterations and quotations omitted); *accord Foster*, 982 F.3d at 968.

> a)   *There Is No Triable Issue Of Fact That PCCS's Responses To Doe's Complaints Were "Clearly Unreasonable In Light Of The Known Circumstances"*

Even if the incidents in this case could be considered actionable harassment, Doe's deliberate indifference claim fails because there is no triable issue of fact as to the "act" element of the deliberate indifference tort. That is, seeing the facts in a light most favorable to Doe, she does not show that Defendants' actions in response to her complaints of alleged sexual harassment were clearly unreasonable or that they subjected her to *further* actionable harassment. *See Univ. of Ky.*, 959 F.3d at 251.

The Court does not consider the garage door incident in evaluating Doe's claim of deliberate indifference because a school cannot be

deliberately indifferent to behavior it is not expected to control. "The deliberate indifference standard requires that the harassment 'take place in a context subject to the school district's control' in circumstances 'wherein the [school district] exercises substantial control over both the harasser and the context in which the known harassment occurs.'" *Pahssen*, 668 F.3d at 362–63 (no deliberate indifference to off-campus harassment incidents). Save a school-sponsored activity, a school exerts no control over student-on-student interactions that occur off campus during school holidays, like the alleged vandalism in this case. *Compare Hamilton Cty. Bd. of Educ.*, 329 F. Supp. 3d at 557 (school deliberately indifferent in its response to rape of a student during an off-campus high school basketball trip that occurred "under" a school "operation") *with Gordon*, 686 F. App'x at 324 (no deliberate indifference to social media harassment where there was no evidence that the school had significant control over the students' harassment).

One reason that PCCS' responses to the other incidents were not "clearly unreasonable" and thus not "deliberately indifferent" is because the school took immediate measures to address Doe's complaints and to protect her access to her education regardless of the outcome of the

34

investigation of her complaints. Although the investigation of H.B.'s first alleged comment to Doe's friend that he "hopes Doe gets raped again" did not corroborate Doe's complaint, Ms. Lett instructed H.B. not to discuss Doe in any way with any person. *See Foster*, 982 F.3d at 970 (prompt investigation and escalating punishments not deliberate indifference); *Stiles*, 819 F.3d at 849 (no deliberate indifference where the school promptly investigated harassment claims and calibrated punishments to investigation results). In *Foster*, the Sixth Circuit explained that the university's actions to ensure the plaintiff's access to her education as she made complaints, including excusing the plaintiff from class, providing the plaintiff with extensions on assignments, and allowing her to retake tests, contributed to their finding that it did not act unreasonably and was not deliberately indifferent to the plaintiff. *See Foster*, 982 F.3d at 967. Like the university in *Foster,* PCCS took steps to mitigate the harm of the harassment on Doe's education, including referring Doe to counseling and allowing her to drop a class. Prior to this incident, Ms. Lett told H.B. to stay away from Doe, spoke to H.B.'s mother about Doe's allegation, and in response to this complaint, she escalated her warning to H.B., instructing him to stay away from Doe and not to discuss her in

any way. *See Stiles*, 819 F.3d at 849 (middle school not deliberately indifferent where the level of punishment, including verbal warnings, was based on the severity of the conduct uncovered through investigations). PCCS's response to Plaintiff's first complaint that H.B. told her friend that he hoped "she gets raped again" was prompt and promoted Doe's access to her education.

PCCS's response to Doe's second complaint—that H.B. insulted her by making a comment to Doe's friend—was not clearly unreasonable, either. Title IX does *not* mandate that schools "purg[e] their schools of actionable peer harassment or that administrators must engage in particular disciplinary action." *Vance*, 231 F.3d at 260 (6th Cir. 2000) (quoting *Davis*, 526 U.S. at 648). In *Doe v. Forest Hills Sch. Dist.*, a case in which the court found a triable issue of fact as to deliberate indifference, the plaintiff was left in the same class as a student after she complained of harassment by that student. *See* No. 1:13-cv-428, 2015 WL 9906260, at *10 (W.D. Mich. Mar. 31, 2015). In contrast, in this case Doe was never in a class with H.B. *c.f. Doe v. Ohio Univ.*, No. 2:21-cv-858, 2022 WL 899687, at *6 (S.D. Ohio Mar. 28, 2022) (allegation that university failed to prevent ongoing "poking and prodding, name-calling,

and other abuses" from harasser's friends in her classes sufficiently pled deliberate indifference).

The nature of the alleged harassment in this case—verbal insults communicated to Doe's friends—justified a less forceful response than the response expected in cases involving physical violence or verbal harassment inflicted *directly* upon the student plaintiff. *Compare Stiles*, 819 F.3d at 850–51 (responses ranging from doing nothing to suspending students based on the "perceived seriousness of each incident" not deliberately indifferent) *with Vance*, 231 F.3d at 262 (deliberate indifference where school that failed to discipline students who stabbed the plaintiff in the hand and held the plaintiff down, pulled her hair, and attempted to rip off her clothes); *Forest Hills Sch. Dist.*, 2015 WL 9906260, at *10 (plaintiff who was sexually assault by another student raised triable issue of fact on the school's deliberate indifference where the school responded with the same verbal reprimand to the attacking student's behavior, which escalated in aggressiveness).

Doe's argument that PCCS's investigation of Doe's complaints was unreasonable does not suffice to show deliberate indifference. (*See* ECF No. 37, PageID.907–910.) Doe argues that the timeliness and

37

organization of the investigation, as well as its noncompliance with Title IX, was an unreasonable action. However, "[n]egligence . . . does not establish deliberate indifference." *Pahssen*, 668 F.3d at 365; *accord Doe v. Hamilton Cty. Bd. of Educ.*, 329 F. Supp. 3d 543, 570 (E.D. Tenn. 2018) (collecting cases). Here, it is uncontested that PCCS interviewed several students regarding Doe's complaints and reviewed video footage of all complaints in which video footage could aid an investigation. Although PCCS involved SROs in the investigation of Doe's complaints, and the SROs were neither PCCS employees nor trained in Title IX, this lack of employment relationship and training does not make their involvement in the investigation of Doe's complaints unreasonable. In cases in which plaintiffs established deliberate indifference based on the funding recipient's investigation, the school did not investigate at all or stopped investigating for months. *See Vance*, 231 F.3d at 262 (no investigation of the parent's detailed complaint filed with Title IX Coordinator); *Forest Hills Sch. Dist.*, 2015 WL 9906260, at *10 (school delayed investigation and punishment of harassing student pending a police investigation). Here, PCCS investigated all of Doe's complaints and there is no evidence that PCCS stopped investigating any of Doe's complaints.

38

After April 2017, PCCS enhanced its investigations of Doe's complaints and took interim measures to protect Doe. The record shows that PCCS enlisted the help of SROs, who reviewed video footage of all incidents after her hospitalization. While investigating these incidents, PCCS changed H.B.'s schedule several times, changed his parking space, and changed his dismissal time to minimize the likelihood that he and Doe would encounter one another at school. In addition, Doe was allowed to change her schedule, reduce her course load, and given access to a Zen room. This is not deliberate indifference under Title IX.

Doe's emphasis on PCCS's failure to comply with Title IX and its internal procedures is misplaced. Noncompliance with Title IX regulations and procedures does not, by itself, establish deliberate indifference or a funding recipient's official decision not to remedy sex-based harassment. See *Gebser v. Lago Vista Indep. Sch. Dist.*, 524 U.S. 274, 291–292 (1998) (failure to promulgate a grievance procedure is not, in and of itself, discrimination under Title IX); *Univ. of Ky.*, 959 F.3d at 252 (school's non-compliance with its own administrative policies was not deliberate indifference where plaintiff did not allege that school's noncompliance caused further harassment); *see also Irvin v. Grand*

39

*Rapids Pub. Sch.*, 366 F. Supp. 3d 908, 921 (W.D. Mich. 2016) (after student was removed from danger, school's failure to conduct Title IX investigation independent of police fails to establish deliberate indifference). In *Doe v. Forest Hills Sch. Dist.*, the court found that the plaintiff raised a triable issue of fact on the issue of a school's deliberate indifference because the school was slow to act or investigate, not because of its noncompliance with Title IX. 2015 WL 9906260, at *10. A school's reasonable response to alleged harassment does not become "clearly unreasonable" because the school fails to comply with Title IX.

In any event, "the occurrence of further harassment is not enough by itself [to establish deliberate indifference under Title IX]; the response's *unreasonableness* must have caused the further harassment." *Kollaritsch*, 944 F.3d at 622 (emphasis in original) (citing *Stiles*, 819 F.3d at 851). That is, the school's unreasonable response must lead to further harassment. *See id.* Here, PCCS's responses were not unreasonable. Therefore, PCCS responses to Doe's complaints were not deliberately indifferent under Title IX.

## B.     Title IX Retaliation (Count II)

Doe's Title IX retaliation claim against PCCS appears to be entirely premised on her allegation that SRO Colthurst told E.L. that "[SRO Colthurst] did not believe [Doe] and that if [Doe] continued to make up stories [SRO Colthurst] was going to file felony charges against her." (ECF No. 34-1, PageID.720.) Defendants argue that this claim should be dismissed because SRO Colthurst's comments cannot be attributed to PCCS. Defendants note that SRO Colthurst, a police department employee, made this comment while responding to a report that E.L. made to the police. Moreover, Defendants assert that there is no evidence that appropriate school administrators were aware of his comments. Doe counters that PCCS "entrusted its Title IX responsibilities" to the SROs and that the "dramatic shift in tone" of "accus[ing] Plaintiff of making false allegations [and] threatening her with a felony charge if she were to make another 'false report'" was retaliation under Title IX. (ECF No. 42, PageID.1282–1283.)

To prevail a on a Title IX retaliation claim, a plaintiff must show "'that (1) [s]he engaged in protected activity, (2) [the funding recipient] knew of the protected activity, (3) [s]he suffered an adverse school-related

action, and (4) a causal connection exists between the protected activity and the adverse action.'" *Bose v. Bea*, 947 F.3d 983, 988 (6th Cir. 2020) *cert. denied*, 141 S. Ct. 1051 (2021). Under Title IX, an educational institution is responsible "only for its 'own official decision[s].'" *Id.* at 991 (quoting *Gebser*, 524 U.S. at 290–91). Therefore, it is inappropriate to use agency principles to impute liability to a school for the misconduct of the people who work at the school. *See id.* at 990 (quoting *Davis*, 562 U.S. at 642).

Doe's Title IX retaliation claim also fails as a matter of law because she fails to show that PCCS was aware of SRO Colthurst's purported threat. Plaintiff fails to point to evidence in the record that *any* officials at PCCS were aware of SRO Colthurst's alleged threat. Indeed, Ms. Lett was on parental leave at the time of the incident (ECF No. 33-6, PageID.259) and Ms. Barbee specifically testifies that she does not recall SRO Colthurst's statement to E.L. (*see* ECF No. 33-7, PageID.310.)

Moreover, even if SRO Colthurst could be considered an agent of PCCS because of his involvement in sexual harassment investigations—which the Court doubts because he was an employee of the Canton Police Department and not PCCS—the Sixth Circuit has made clear that the

42

discriminatory animus of an agent of a school cannot be assigned to the school for a Title IX retaliation claim. *See Bose*, 947 F.3d at 994.

Although the Court questions whether SRO Colthurst's "threat" may be considered an "adverse action school-related action," it need not address this issue because Doe may not attribute SRO Colthurst's actions to PCCS for this claim. *Bose*, 947 F.3d at 991 (collecting cases). Therefore, the Court grants summary judgment to Defendants on Doe's Title IX retaliation claim.

### C.    § 1983 Claims (Counts III and IV)

Counts III and IV are Fourteenth Amendment claims under 42 U.S.C. §1983. In Count III, Doe claims that the individual Defendants were deliberately indifferent to the sex-based harassment at issue in this case, and that their failure to act reasonably violated Doe's Fourteenth Amendment right to equal protection. (*See* ECF No. 1, PageID.26; ECF No. 42, PageID.1283–1288.) In Count IV, Doe claims that PCCS's policy or custom of failing to train its staff in Title IX and failing to implement its own Title IX procedures—the municipal liability claim—caused her to suffer sex-based harassment. Defendants move for summary judgment on Doe's Equal Protection claim and her municipal liability claim,

arguing that they did not respond unreasonably to Doe's complaints. Just as Doe fails to show that Defendants were deliberately indifferent to her complaints of sex-based harassment, so too does she fail to show that either that the individual Defendants or PCCS were deliberately indifferent to sex discrimination in violation of the Equal Protection clause.

"To state a claim under 42 U.S.C. §1983, a plaintiff must set forth facts that, when construed favorably, establish (1) the deprivation of a right secured by the Constitution or laws of the United States (2) caused by a person acting under the color of state law." *Miami Univ.*, 882 F.3d at 595 (quoting *Heyne v. Metro. Nashville Pub. Schs.*, 655 F.3d 556, 562 (6th Cir. 2011)).

There is no dispute that public school districts are state actors. Public school officials, like the individual Defendants in this case, act within the scope of their duties when they represent the school. *See Brentwood Acad. v. Tenn. Secondary Sch. Athletic Ass'n*, 531 U.S. 288, 299 (2001). Therefore, Doe has adequately pled that Defendants were acting under the color of state law for the purposes of § 1983. *See*

44

*Wortmann v. Ann Arbor Pub. Schs.*, No. 13-14350, 2015 WL 1182043, at *3 (E.D. Mich. Mar. 13, 2015).

       *i.*   *Equal Protection*

"The Sixth Circuit recognizes two methods of proving an equal protection violation based on a school official's response to student-on-student harassment: (1) disparate treatment of one class of students who complain about bullying as compared to other classes of students and (2) deliberate indifference to discriminatory peer harassment." *Stiles*, 819 F.3d at 851–52 (internal citations omitted). Doe bases her §1983 Equal Protection claim only on a theory of deliberate indifference. (*See* ECF No. 42, PageID.1283–1290.)

"The deliberate indifference standard used for proving a §1983 equal protection violation in student-on-student harassment cases is 'substantially the same' as the deliberate indifference standard applied in Title IX cases." *Stiles*, 819 F.3d at 852 (citing *Williams ex rel. Hart v. Paint Valley Local Sch. Dist.*, 400 F.3d 360, 369 (6th Cir.2005)). Because Doe cannot establish deliberate indifference under Title IX, she cannot show deliberate indifference under §1983.

### ii.    Municipal Liability

Doe's municipal liability claim also fails because Doe does not establish deliberate indifference under Title IX. "The absence of deliberate indifference pursuant to a Title IX claim is fatal to a companion municipal liability claim made under §1983." *McCoy v. Bd. of Educ., Columbus City Schs.*, 515 F. App'x 387, 393 (6th Cir. 2013) (citing *Henderson v. Walled Lake Consol. Schs.*, 469 F.3d 479, 492 (6th Cir. 2006)). Therefore, the Court grants Defendants summary judgment on Doe's municipal liability claim.

## D.    Elliott-Larsen Civil Rights Act Claim (Count V)

Doe's remaining claim arises under state law. Where, as here, the Court has dismissed a plaintiff's federal law claims, it should not ordinarily reach the plaintiff's state law claims. *See United Mine Workers of Am. v. Gibbs*, 383 U.S. 715, 726 (1966); *Rouster v. Cty. of Saginaw*, 749 F.3d 437, 454 (6th Cir. 2014); *Jones v. Univ. of Detroit Mercy*, 527 F. Supp. 3d 945, 951 (E.D. Mich. 2021). Therefore, the Court declines to exercise supplemental jurisdiction over Doe's state law claim and dismisses it without prejudice.

## IV.  CONCLUSION

For the reasons set forth above,

IT IS ORDERED that Doe's motion for summary judgment (ECF No. 37) is DENIED.

IT IS FURTHER ORDERED that Defendants' motion for summary judgment (ECF No. 33) is GRANTED IN PART and Doe's Title IX claims (Counts I and II) and §1983 claims (Counts III and IV) are DISMISSED.

IT IS FURTHER ORDERED that Doe's remaining state law claim (Count V) is DISMISSED WITHOUT PREJUDICE pursuant to 28 U.S.C. § 1367.

IT IS SO ORDERED.

Date: June 3, 2022                    s/Judith E. Levy
Ann Arbor, Michigan            JUDITH E. LEVY
                                            United States District Judge


## CERTIFICATE OF SERVICE

The undersigned certifies that the foregoing document was served upon counsel of record and any unrepresented parties via the Court's ECF System to their respective email or first-class U.S. mail addresses disclosed on the Notice of Electronic Filing on June 3, 2022.

                                            s/William Barkholz
                                            WILLIAM BARKHOLZ
                                            Case Manager

47